Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with minor modifications as follows:
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. It is stipulated that all parties have been correctly designated, and there is no question as to misjoinder or non-joinder of parties.
3. In addition to the other stipulations contained herein, the parties stipulate and agree with respect to the following undisputed facts:
a. An Industrial Commission Form 21 Agreement was signed by the parties and approved by the Industrial Commission in this case.
b. Defendants are liable for the physical injuries incurred by plaintiff in an injury by accident on July 16, 1993 which occurred in the course and scope of her employment with the defendant Wal-Mart Stores, Inc.
c. The average weekly wage of plaintiff is $353.27.
4. Plaintiff has not returned to work since at least some time in or before 1997.
***********
Based upon the competent evidence of record herein, the Full Commission adopts the Findings of Fact of the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty years of age with a tenth grade education. She went on to receive her GED, but received no further educational training. Her work history included day care and retail sales.
2. Plaintiff sustained an admittedly compensable injury at work on July 16, 1993 when she lost her balance and fell, injuring her back. A Form 21 Agreement was approved by the Industrial Commission on September 19, 1996 and plaintiff began receiving disability compensation beginning September 22, 1993 for her injury. The parties subsequently entered into three Forms 26, each of which was approved by the Industrial Commission on September 19, 1996 for various dates of disability. Plaintiff continues to receive weekly payments as reflected on Stipulated Exhibit 2 — "Attachment to Form 33R."
3. Following her injury, plaintiff was initially treated by family physician Dr. John McFadden who subsequently referred plaintiff to Dr. M. B. Hussey, a neurosurgeon, for further treatment. She underwent a lumbar CT scan which revealed a small, but focal, disc herniation on the right at L5-S1 and moderate central disc protrusion at L4-5.
4. After initially attempting conservative treatment, Dr. Hussey performed a partial hemilaminectomy at L5-1 on October 13, 1993. Following surgery, plaintiff developed apparent right foot weakness and numbness and by November 1993, Dr. Hussey was concerned that there might be a recurrent disc herniation. An MRI in December 1993 revealed another large ruptured disc and plaintiff underwent surgery for the recurrent disc on January 5, 1994. Dr. Hussey reported that there was no leg pain following the second surgery and described her recovery as "good."
5. Plaintiff was out of work as a result of her surgeries from September 28, 1993 through at least March 22, 1994 pursuant to Dr. Hussey's instructions. On March 22, 1994, he allowed her to return to work for four hours per day with a twenty pound lifting restriction. Plaintiff's work hours were gradually increased after that.
6. Dr. Hussey continued to treat plaintiff through November 1994. During that period, plaintiff described an increase in pain and Dr. Hussey held plaintiff out of work for a short period in late July 1994 until August 9, 1994. As of September 13, 1994, plaintiff was again working four hours per day with no lifting greater than ten pounds.
7. On September 8, 1994, plaintiff began treating with an orthopedic surgeon, Dr. Paul Long. Plaintiff was discharged by Dr. Hussey shortly thereafter because Dr. Long planned to do a fusion. On November 30, 1994, Dr. Long performed a two-level fusion and removed an extruded piece of disc which he felt was the cause for an essentially paralyzed right foot. At the next examination on December 9, 1994, there had been a return of normal sensation to the right foot and normal motor activity in the previously paralyzed muscles of that foot. Following surgery, the straight leg raising test was improved and normal at ninety degrees. In January 1995, Dr. Long felt that there had been excellent relief of pre-operative pain.
8. Dr. Long continued to provide treatment throughout 1995 and through February 6, 1996 for plaintiff's complaints of back and right leg pain. By March 1995, the spinal fusion appeared to be solid, and on February 16, 1996, plaintiff was discharged by Dr. Long at maximum medical improvement and with a fifteen percent (15%) permanent partial disability rating to the low back. Plaintiff was released to full employment with no restriction on bending or lifting. However, throughout Dr. Long's treatment of plaintiff, she appeared to be under a lot of stress and concern and needed a lot of extra support, explanation and care to cope with the pain and discomfort of her surgery.
9. After being released by Dr. Long, plaintiff was seen by Dr. David Kelly at Wake Forest University, complaining of continued pain and increasing numbness and weakness in the right leg. Dr. Kelly recommended an MRI which was done on September 17, 1996 and which showed satisfactory post-operative appearance of the disc, no recurrent disc, no significant scar tissue, no spinal stenosis or narrowing of the spinal canal, no infection or tumor, and no slippage of the bone. X-rays did show some degeneration of the discs at a few levels consistent with the natural process of aging. Dr. Kelly saw plaintiff again in November 1996 but recommended no surgery for her symptoms.
10. Plaintiff has received no additional treatment for her back since seeing Dr. Kelly in November 1996. She returned to Dr. Long for re-evaluation and review of her permanent impairment rating on May 12, 1998 at which point Dr. Long increased her rating to thirty percent (30%) of the back based upon plaintiff's post operative fusion with recurrent episodes of significant back pain. Dr. Long testified that the objective findings had not changed much other than reduced muscle strength and "give away weakness". Dr. Long's clinical opinion is that plaintiff still had some tightening of the surgical scar tissue and residual weakness at the site.
11. Plaintiff has also received psychological and psychiatric treatment. She initially saw psychologist Dr. Jake Ricketson on May 22, 1995. Dr. Ricketson performed a psychological evaluation and initially diagnosed adjustment disorder with anxiety and depression. He commenced with individual therapy sessions, the last of which occurred on August 3, 1995. Plaintiff was also placed on anti-depressant medication.
12. Plaintiff's depression began to lift and improved through July 20, 1995 at which point she was experiencing increased depression coinciding with the death of her ex-husband and with another fall. Plaintiff also experienced an increase in back and right leg pain in July 1995.
13. Dr. Ricketson's final diagnosis was major depressive episode, moderate, with psychosis. Dr. Ricketson opined that plaintiff's injury by accident of July 16, 1993 was a significant causal factor for her condition. He also opined that plaintiff was not psychologically capable of working as of his last appointment with her on August 3, 1995.
14. On July 20, 1995, Dr. Ricketson referred plaintiff to Dr. Richard Spencer, a psychiatrist. Dr. Spencer's initial diagnosis was adjustment disorder which had evolved into major depression with concomitant anxiety. Dr. Spencer did not consider plaintiff as having any congenital neurologic disorders.
15. In September of 1995, plaintiff was suffering from anergia, almost a total lack of energy and anhedonia, which is a loss of interest in any gratification. By November 1995 plaintiff's grief from the loss of her ex-husband was beginning to resolve.
16. Even though plaintiff faced a number of stressors during the course of psychiatric treatment, including the death of her ex-husband, problems in her current marriage, and alleged sexual harrassment at work when she returned briefly after her injury, plaintiff's back injury played a significant role in her continuing depression. In Dr. Spencer's opinion, plaintiff's depression for which he treated her was an outgrowth of the injury by accident of July 16, 1993.
17. Dr. Spencer continues to treat plaintiff through the present. In 1997 plaintiff developed hallucinatory activity for which medications were prescribed, however, her condition did not improve. During 1998, plaintiff made some improvements, but she continued to be disabled from working, as is the case at present. Plaintiff has not reached maximum medical improvement from her depression and other psychological disorders.
18. Plaintiff is in need of future psychiatric treatment and prescription medication to effect a cure and/or provide relief of her back injury and resulting psychiatric and psychological symptoms.
19. In October 1997, plaintiff was evaluated by Dr. Verne Schmickley, Ph.D. Test results revealed that plaintiff suffered from extreme depression with an acute suicidal risk. He agreed with Dr. Spencer's diagnosis of major depressive disorder; however, Dr. Schmickley opined that the cause of the disorder was not related to her back injury, but rather was endogenous and a result of biochemical factors.
20. Greater weight is assigned to the opinions of Dr. Ricketson and Dr. Spencer with respect to the causation of plaintiff's depression and the extent of her disability.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on July 16, 1993, resulting in a back injury. N.C. Gen. Stat. § 97-2(6).
2. As a result of her admittedly compensable injury by accident of July 16, 1993, plaintiff suffers from major depression disorder, which has disabled her from earning any wages since November 12, 1996. N.C. Gen. Stat. § 97-29.
3. As a result of her admittedly compensable injury by accident of July 16, 1993 and the resulting injuries, plaintiff is entitled to temporary total disability benefits payable by defendants at the rate of $235.73 and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to payment of medical expenses, including expenses incurred for psychiatric and psychological treatment, designed to effect a cure or provide relief of her condition. N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees approved herein, for her continuing temporary total disability, defendants shall pay to plaintiff temporary total disability compensation at the rate of $235.73, from November 12, 1996 and continuing until further Order of the Industrial Commission. Defendants are entitled to a credit for temporary total disability payments made during this time period.
2. Defendants shall pay all medical expenses for treatment incurred by plaintiff as a result of her admittedly compensable injury by accident of July 16, 1993, for so long as said treatment is designed to effect a cure or provide relief of plaintiff's condition. Medical bills shall be submitted according to proper Industrial Commission procedure.
3. An attorney's fee is approved in the amount of twenty-five percent of the Award in Paragraph 1 and shall be paid directly to plaintiff's counsel.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ LAURA K. MAVRETIC COMMISSIONER
jcb